FILED
SEP 3 0 2010

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**ASH GROVE CEMENT COMPANY,**
a Delaware corporation,

Case No.  09-239-KI

Plaintiff,

OPINION AND ORDER

vs.

**LIBERTY MUTUAL INSURANCE COMPANY,**
a Massachusetts insurance company, **TRAVELERS
INSURANCE COMPANY,** a Connecticut insurance
company; **HARTFORD ACCIDENT** and
**INDEMNITY COMPANY,** a Connecticut insurance
company; and **UNITED STATES FIDELITY &
GUARANTY COMPANY,** a Maryland insurance company,

Defendants.

Michael E. Farnell
Spencer S. Adams
Seth H. Row
Parsons Farnell & Grein, LLP
1030 SW Morrison Street
Portland, Oregon  97205

Page 1 - OPINION AND ORDER

2010.ash.grove.op.wpd

This is an action for declaratory judgment between an insured, Ash Grove Cement Company ("Ash Grove") and its liability insurers, Liberty Mutual Insurance Company ("Liberty Mutual"), Hartford Accident and Indemnity Company ("Hartford"), and the United States Fidelity & Guaranty Company ("USF & G") (collectively, "the insurers"). Ash Grove, Liberty Mutual and USF & G have filed cross motions for partial summary judgment.

The issue raised by the motions is whether a request for information from the United States Environmental Protection Agency ("EPA") to Ash Grove, pursuant to section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9604(e), constitutes a "suit" under the terms of the insurance policies, triggering the insurers' duty to defend Ash Grove.

## FACTUAL BACKGROUND

Ash Grove operates cement plants on the east shore of the Willamette River near Portland, the Rivergate Facility and the Terminal Facility. Ash Grove's facilities are in an area comprising River Mile 2 to River Mile 11, known as the Portland Harbor Superfund Site ("the Site"). The EPA listed the Site on the National Priorities List in December 2000, and sent out approximately 70 general notice letters ("GNLs") informing potentially responsible parties ("PRPs") that they might be liable for costs incurred by the EPA for actions taken at the Site. EPA sent additional GNLs in 2006. Ash Grove was not included in the December 2000 and 2006 mailings.

A remedial investigation and feasibility study ("RI/FS") began at the Site in 2001 and is ongoing. In November 2006, Ash Grove received a letter from a group of companies

OPINION AND ORDER Page

participating in the RI/FS for the Site, the Lower Willamette Group ("LWG"). The LWG letter

stated that Ash Grove had been "identified as a [PRP] with respect to liability for response costs

and damages at the [Site] . . . based on [Ash Grove's] relationship to releases at the Site." Decl.

of Kevin McCurdy Exh. 1. The LWG letter threatened that "if it is necessary to assure protection

of our contribution rights in connection with the funding of the RI/FS, LWG members intend to

file suit for contribution" against Ash Grove. Id. To avoid the threatened action, Ash Grove

entered into a tolling agreement with LWG in late 2006.

On January 18, 2008, the EPA sent a letter to Ash Grove pursuant to section 104(e) of

CERCLA ("the § 104(e) letter" or "EPA letter"). The § 104(e) letter said, in part:

> EPA is now seeking information from current and past landowners, tenants, and
> other entities believed to have information about activities that may have resulted
> in releases or potential threats of releases of hazardous substances to the Site. This
> information will be used for the purposes of determining the need for response, or
> choosing or taking any response action at the Portland Harbor Superfund Site, and
> to identify additional potentially responsible parties for performing the cleanup.

> Pursuant to the authority of Section 104(e) of [CERCLA], you are hereby
> requested to respond to the Information Request attached to this letter. While EPA
> seeks your voluntary cooperation with this investigation, compliance with the
> Information Request is required by law. Failure to respond fully and truthfully to
> the Information Request by the due date provided below may result in an
> enforcement action by EPA. Under Section 104(e)(5)(B) of CERCLA, 42 U.S.C.
> § 9604(e)(5)(B), pursuant to the Federal Civil Penalties Inflation Adjustment Act
> of 1990, 28 U.S.C. § 2461, as amended by the Debt Collection Improvement Act
> of 1996, 31 U.S.C. § 3701, EPA is authorized to commence an action to assess
> civil penalties of not more than $32,500 per day for each day of noncompliance
> against any person who unreasonably fails to comply with an Information
> Request.

McCurdy Decl. Exh. A.

The § 104(e) letter included 82 questions, with subparts, and required Ash Grove to seek

information from former employees and agents, as well as documents. Ash Grove represents that

OPINION AND ORDER Page

responding to the § 104(e) letter and other demands by EPA and other entities involved with the

Site has cost over $750,000.

Shortly after receiving the EPA's letter, Ash Grove received a letter from the Portland

Harbor Natural Resource Trustee Council ("Council"), a consortium of tribal governments and

federal and state governmental agencies.  The letter said Ash Grove had been "identified" by the

Council as an "entity that may potentially be liable for response costs under . . . CERCLA."

McCurdy Decl. Exh. 4.  Accompanying the letter was the Council's Determination and Notice of

Intent to Perform Injury Assessment of the Site. The Determination said, "You and the other

PRPs are invited to fully fund this assessment, and to participate in the development of the type

and scope of the assessment, and in the performance of the assessment as agreed to by the

Trustees' Council."  Id.

Liberty Mutual had issued seven insurance policies to Ash Grove's predecessor between

1963 and 1969. Decl. of Laurie Dunn Exh. 1-7. The policies in effect from 1963 to 1966

provided coverage for

> all sums which the insured shall become legally obligated to pay as damages
> because of injury to or destruction of property, including the loss of use thereof,
> caused by accident.

Id. at Exh. 4-7.  Liberty Mutual agreed to

> defend any suit against the insured alleging such . . . destruction and seeking
> damages on account thereof, even if such suit is groundless, false or fraudulent . . .

Id.

The later policies provided coverage for:

> all sums which the insured shall become legally obligated to pay as damages

OPINION AND ORDER Page

> because of property damage to which this policy applies, caused by an occurrence and the company shall have the right and duty to defend any suit against the insured seeking damages on account of . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . . .

Id. at Exh. 1-3.

From 1973 through 1986, USF & G issued 10 liability insurance policies to Ash Grove.

The USF & G policies provided:

> The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> > A.    bodily injury, or
> >
> > B.    property damage
>
> to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may take such investigations and settlement of any claim or suit as it deems expedient.

Decl. of Paula Rose Exh. 1.  None of the policies defines "suit."

Ash Grove first notified Liberty Mutual about potential claims related to the Site when it forwarded the LWG letter in January 2007, but it did not ask Liberty Mutual to take any action. Ash Grove continued to keep Liberty Mutual apprised of developments until May 2008, when Ash Grove requested reimbursement from Liberty Mutual and USF & G for amounts expended in responding to the EPA letter. In June 2008, Liberty Mutual informed Ash Grove that it had no obligation to defend or reimburse Ash Grove because the EPA letter was not a lawsuit. USF & G took the same position.

## STANDARDS

The interpretation of an insurance contract is a question of law for the court.  Hoffman

OPINION AND ORDER Page

Const. Co. v. Fred S. James & Co., 313 Or. 464, 469, 836 P.2d 703 (1992). If a policy term has more than one plausible meaning, the court scrutinizes each meaning in light of the particular context in which the term is used in the policy and in the context of the policy as a whole. Hiebert v. Farmers Ins. Co. of Oregon, 172 Or. App. 13, 17, 18 P.3d 397 (2001). If, after scrutiny, both proposed interpretations seem reasonable, the court interprets the provision against the drafter. Id. at 17-18, 18 P.3d at 400.

An insurer's duty to defend its insured depends upon two documents: the complaint and the insurance policy. Ledford v. Gutoski, 319 Or. 397, 399, 877 P.2d 80 (1994); Abrams v. General Star Indem. Co., 335 Or. 392, 396, 67 P.3d 931 (2003). An insurer has a duty to defend an action against its insured if the claim against the insured stated in the complaint could, without amendment, impose liability for conduct covered by the policy. Ledford, 319 Or. at 399-400. The insurer has a duty to defend if the complaint provides any basis for which the insurer provides coverage. Id. at 400 (emphasis in original); see also  Certain Underwriters at Lloyd's London and Excess Ins. Co., Ltd. v. Massachusetts Bonding and Ins. Co., 235 Or. App. 99, 122, 230 P.3d 103, 117 (2010) ("Lloyd's") (in considering the duty to defend, courts must determine whether there is a "possibility" that the allegations stated are covered under the policy; if a reasonable interpretation of the allegations would bring them within coverage, there is a duty to defend) (citing Paxton Mitchell Co. v. Royal Indem. Co., 279 Or. 607, 611, 569 P.2d 581 (1977)).

An administrative agency's requirement that a property owner clean up environmental contamination constitutes a "suit" within the terms of an insurer's duty to defend. Schnitzer Inv. Corp. v. Certain Underwriters, 197 Or. App. 147, 155, 104 P.3d 1162, 1168 (2005), aff'd, 341 Or. 128, 137 P.3d 1282 (2006).

OPINION AND ORDER Page

The Oregon Environmental Cleanup Assistance Act ("OECAA"), Or. Rev. Stat. §

465.480, provides:

> (a)  "Suit" or "lawsuit" includes but is not limited to formal judicial
> proceedings, administrative proceedings and actions taken under
> Oregon or federal law, including actions taken under
> administrative oversight of the Department of Environmental
> Quality or the United States Environmental Protection Agency
> pursuant to written voluntary agreements, consent decrees and
> consent orders.
>
> * * *
>
> (2)  Except as provided in subsection (7) of this section, in any action between
> an insured and an insurer to determine the existence of coverage for the
> costs of investigating and remediating environmental contamination,
> whether in response to governmental demand or pursuant to a written
> voluntary agreement, consent decree or consent order, including the
> existence of coverage for the costs of defending a suit against the insured
> for such costs, the following rules of construction shall apply in the
> interpretation of general liability insurance policies involving
> environmental claims:
>
> . . . .
>
> (b)  Any action or agreement by the Department of Environmental Quality or
> the United States Environmental Protection Agency against or with an
> insured in which the Department of Environmental Quality or the United
> States Environmental Protection Agency in writing directs, requests or
> agrees that an insured take action with respect to contamination within the
> State of Oregon is equivalent to a suit or lawsuit as those terms are used in
> any general liability insurance policy.
>
> . . . .
>
> (7)  The rules of construction set forth in this section do not apply if the application of
> the rule results in an interpretation contrary to the intent of the parties to the
> general liability insurance policy.

## DISCUSSION

The insurers assert that a § 104(e) letter does not constitute a "suit" under the OECAA

because the statute requires either an "action" by the EPA "against" the insured, or an

OPINION AND ORDER Page

"agreement" between the EPA and the insured, in which the EPA requests that the insured "take action with respect to contamination." The insurers argue that it is undisputed that there is no agreement, and, further, that the § 104(e) letter is not an "action" and "does not require Ash Grove to take action" related to contamination. Rather, the § 104(e) letter "simply asks Ash Grove to voluntarily provide information," a "benign request" that is "not adversarial," and imposes no obligation on Ash Grove to investigate, remediate or clean up contamination.

I do not find the insurers' argument persuasive. The § 104(e) letter says that while EPA seeks Ash Grove's "voluntary cooperation," compliance with the request is "required by law," and that if Ash Grove fails to respond fully within a certain time, EPA can commence an action for civil penalties of up to $32,500 per day for noncompliance. The letter is not merely a request that Ash Grove provide information; it contains a threat of legal action and substantial penalties for failure to comply with the request. In Aetna Cas. and Surety Co. v. Pintlar Corp., 948 F.2d 1507, 1516 (9th Cir. 1991), the court, construing a PRP notice under CERCLA in a liability policy governed by Idaho law, observed,

> Unlike the garden variety demand letter, which only exposes one to a potential threat of future litigation, a PRP notice carries with it immediate and severe implications. Generally, a party asserting a claim can do nothing between the occurrence of the tort and the filing of the complaint that can adversely affect the insureds' rights. However, in a CERCLA case, the PRP's substantive rights and ultimate liability are affected from the start of the administrative process.

The court noted that "[i]n many instances, it is more prudent for the PRP to undertake the environmental studies and cleanup measures itself than to await the EPA's subsequent suit in a cost recovery action." Id. at 1517.

The Pintlar court's rationale for construing the PRP notice applies to a § 1403 letter as

OPINION AND ORDER Page

well; in view of the substantial penalties available to the EPA should Ash Grove not comply with the letter's requests, it is not accurate to say that the letter imposed no obligation on Ash Grove to investigate the contamination. See Lloyd's, 235 Or. App. at 122, 230 P.3d at 117 (while a DEQ letter naming the insured as a PRP "could be read narrowly" as "merely recommending further investigation," it was also reasonable to infer that it required the insured to determine, not whether there was contamination at the site, but the extent of it).

The insurers also argue that applying the rule of construction in the OECAA to this case would be contrary to the intent of the parties, since the OECAA did not exist when the insurance contracts were executed. But because the words "suit" and "claim" are not defined in the policies, the intent of the parties at the time the policies were issued cannot be ascertained one way or the other. The mere fact that the OECAA had not been passed when the policies were issued is not dispositive. See, e.g., Evraz Oregon Steel Mills, Inc. v. Continental Ins. Co., No. CV 08-477-JE, 2009 WL 789658 (D. Or. Mar. 20, 2009) (applying OECAA to pending environmental actions, although policies had been issued from 1968-1974 and 1976-1990, and one of the excess policies had been lost); Fireman's Fund Ins. Co. v. Ed Niemi Oil Co., Inc., No. CV 03-25-MO, 2005 WL 3050460, at *3 (D. Or. Nov. 9, 2005) (applying OECAA to form contract provided by insurer after original policy "lost due to the passage of time").

The primary goal in construing an insurance contract is to ascertain the intention of the parties in the context of the policy as a whole. Hiebert, 172 Or. App. at 17, 18 P.3d at 400. The general purpose of the policies at issue here was to provide Ash Grove with insurance coverage for liabilities and damages that Ash Grove incurred because of property damage. The policies neither defined "suit" nor limited its meaning through exclusions. See ZRZ Realty Co. v.

OPINION AND ORDER Page

Beneficial Fire and Cas. Ins. Co., 222 Or. App. 453, 473, 194 P.3d 167 (2008) ("Conceptually . . . the coverage provisions of an insurance policy define the universe of claims that are covered by the policy; the exclusions constitute a subset of claims that, although within that universe of covered claims, are nonetheless excluded.")   A reasonable insured could interpret the § 104(e) letter as an "effort to impose on policyholders a liability ultimately enforceable by a court," triggering the need for a defense, see Pintlar, 948 F.2d at 1516, and the insured is entitled to the advantage of the court's interpreting the policy provision against the drafting party.   Hiebert, 172 Or. App. at 17-18, 18 P.3d at 400.

In its motion papers, Liberty Mutual asserted that the OECAA was unconstitutional as applied to the facts of this case because it was violative of the Oregon Constitution's prohibition on any law "impairing the obligation of contract." Or. Const. Art. I, § 21. The State of Oregon filed a motion to intervene (doc. # 97) and submitted briefing and exhibits on the question. In its response to the state's memorandum, Liberty Mutual represented to the court that "Liberty Mutual's position does not depend on a finding that the OECAA is unconstitutional," and "[t]he court need not consider whether the OECAA, if applied to this case, would substantially impair Liberty Mutual's obligation under its contract with Ash Grove."  Liberty Mutual Resp. to State of Oregon's Mem. on the Constitutionality of the OECAA at 2, 9.  The court construes these statements as a withdrawal by Liberty Mutual of its argument that the OECAA is unconstitutional as applied to this case.

OPINION AND ORDER Page

## CONCLUSION

The EPA letter to Ash Grove was equivalent to a "suit seeking damages" under Ash Grove's liability policies, pursuant to the OECAA. The insurers have a duty to defend Ash Grove.  Ash Grove's motions for partial summary judgment (doc. # 72, 80) are GRANTED. Liberty Mutual's motion for partial  summary judgment (doc. # 55), in which USF & G joined, and USF & G's separate motion for partial summary judgment (doc. # 67) are DENIED.

IT IS SO ORDERED.

Dated this  30th day of September 2010.


 /s/ Garr M. King

OPINION AND ORDER Page