IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**ASH GROVE CEMENT COMPANY**,  3:09-cv-00239-KI
a Delaware corporation,

               Plaintiff,  OPINION AND ORDER

  vs.

**LIBERTY MUTUAL INSURANCE COMPANY**,
a Massachusetts insurance company, **TRAVELERS INSURANCE COMPANY**, a Connecticut insurance company; **HARTFORD ACCIDENT** and **INDEMNITY COMPANY**, a Connecticut insurance company; and **UNITED STATES FIDELITY & GUARANTY COMPANY**, a Maryland insurance company,

               Defendants.

    Michael E. Farnell
    Spencer S. Adams
    Seth H. Row
    Parsons Farnell & Grein, LLP
    1030 SW Morrison Street
    Portland, Oregon  97205

Page 1 - OPINION AND ORDER

Daniel A. Zariski
Michael R. Wrenn
Wolfe Wrenn & Zariski
Two Union Square
601 Union Street, Suite 5110
Seattle, Washington 98101

       Attorneys for Plaintiff

Kevin G. McCurdy
McCurdy & Fuller
4300 Bohannon Drive, Suite 240
Menlo Park, California 94025

Kimberly R. Griffith
Thomas M. Christ
Cosgrave Bergeer Kester, LLP
805 SW Broadway, 8th Floor
Portland, Oregon 97205

       Attorneys for Defendant Liberty Mutual Insurance Company

Thomas A. Gordon
Andrew S. Mosses
Gordon & Polscer, LLC
9755 S. W. Barnes Rd., Suite 650
Portland, Oregon 97225

       Attorneys for Defendant United States Fidelity & Guaranty Company

KING, Judge:

Plaintiff Ash Grove Cement Company ("Ash Grove") filed this action seeking a declaratory judgment that its insurers, defendants Liberty Mutual Insurance Company ("Liberty Mutual") and United States Fidelity and Guaranty Company ("USF&G") have a duty to defend and indemnify Ash Grove concerning contamination at the Portland Harbor Superfund Site ("Site"). I previously held that the insurers had a duty to defend Ash Grove. The parties now dispute the scope of the duty to defend and have filed cross motions for summary judgment. As

PAGE 2 - OPINION AND ORDER

discussed below, I am able to determine what law I will follow but factual issues preclude me from applying the law to the facts.

**FACTS**

On January 11, 2008, David Batson wrote Ash Grove as a convening neutral to invite the company to an informational meeting of parties associated with the Site. Batson explained that he would:

> serve as a confidential neutral professional and assist parties to prepare for eventual negotiations with federal and state agencies through organizing into a group of potentially responsible parties (PRPs) and conducting an allocation of site costs among parties associated with the Site. I serve at the discretion of an initial group of parties (the Convening Group) brought together by the U.S. Environmental Protection Agency (EPA) for the purpose of exploring the creation of a PRP Group.
>
> . . . .
>
> . . . There are no preconditions or commitments required for your attendance at the convening meeting; just your desire to learn about how to take advantage of the opportunity of joining other similarly situated parties in meeting your common interests.

McCurdy Decl. Ex. 4, at 1, 3.

Ash Grove joined the ADR process explained in Batson's letter, also known as the allocation process. Approximately 70 entities are taking part in this process. Ash Grove retained Leslie Nellermoe to represent it in connection with the Site. Nellermoe states that the EPA informed companies participating in the ADR process that it intends to negotiate only with entities that participated.

Ash Grove's expert witness, J.W. Ring, is an attorney who has dealt with Superfund sites in more than 15 states. He currently represents two clients in conjunction with the Portland Site

PAGE 3 - OPINION AND ORDER

which are not involved in the litigation before me.  According to Ring, convening neutrals, such as Batson, are EPA employees assigned to gather private parties together to begin a group ADR process.  The convening neutral does not use EPA letterhead because he is not formally advocating for the EPA's position in the process.  The EPA compensates the neutral at first but conditions approval of a settlement on the private parties reimbursing the EPA for the neutral's costs.  In Ring's experience, an entity that receives an invitation from a convening neutral should consider itself as having been identified by the EPA as a potentially responsible party.  In Ring's opinion, an entity that does not participate in the ADR process severely limits its options for opposing full joint and several liability for the cleanup.

The EPA sent Ash Grove a 104(e) request[1] on January 18, 2008.  The EPA sent such requests to 326 entities seeking information about activities that could have resulted in releases of hazardous substances at the Site.  The EPA uses the information it obtains to determine the need for any response action at the Site and to identify additional potentially responsible parties

---

[1] "Under section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, commonly referred to as Superfund), EPA is authorized to seek information involving sites containing hazardous substances.  Early in the cleanup process, EPA conducts a search to find all of the potentially responsible parties (PRPs).  EPA looks for evidence to determine liability by matching wastes found at the site with parties that may have contributed wastes to the site.  EPA uses many approaches to do this research, including the use of 'information request letters' to gather information."
http://www.epa.gov/compliance/resources/publications/cleanup/superfund/104e/ (last visited June 20, 2011).

for performing the cleanup. The EPA sent General Notice Letters[2] to 141 entities identified as potentially responsible parties at the Site.[3]

On January 29, 2008, Ash Grove sent USF&G a copy of the 104(e) request it received, along with: (1) copies of letters the Lower Willamette Group ("LWG") sent Ash Grove naming it as an alleged potentially responsible party and threatening to file suit for contribution; and (2) a tolling agreement Ash Grove entered into with the LWG. Ash Grove informed USF&G that it had no time to notify it prior to signing the tolling agreement, but that Ash Grove believed the tolling agreement also benefitted its insurers. Ash Grove also stated, "Please accept this notice as a first report of claim." Rose Decl. Ex. 1.

Also on January 29, 2008, Ash Grove sent Liberty Mutual a copy of the 104(e) request but did not attach the other documents. The cover letter was very brief, advising that the company had a policy which would apply to "this claim" and stating that the company would keep the insurer informed of any further developments. Pearson Decl. Ex. 1, at 1.

USF&G wrote Ash Grove on February 25, 2008 to acknowledge receipt of the January 29 letter and to state that it was searching for potentially applicable policies. The insurer explained it would review the policies to determine if USF&G had a duty to pay some or all of the costs for

---

[2] "General notice letters inform recipients that they are: identified as PRPs at Superfund sites, that they may be liable for cleanup costs at the site, and explains the process for negotiating the cleanup with EPA. The letter also includes information on Superfund, the site, and may include a request for additional information."
http://www.epa.gov/compliance/cleanup/superfund/notice.html (last visited June 20, 2011).

[3] Kevin McCurdy, counsel for Liberty Mutual, supplied these figures; he obtained the data from the EPA's web site on May 4, 2011. Leslie Nellermoe, counsel for Ash Grove, reported the EPA sent 278 section 104(e) requests and 103 General Notice Letters. The slight differences are insignificant for this argument.

PAGE 5 - OPINION AND ORDER

a lawyer to represent Ash Grove in the Site dispute and if USF&G had a duty to indemnify Ash Grove for some or all of the costs associated with the resolution of the matter. USF&G also told Ash Grove that it should take any steps necessary to fully protect its rights in the matter but, "Should it be determined that we will participate in representation of Ash Grove Cement Company under any alleged policies, only fees incurred on or after the date of tender will be considered for reimbursement." Id. Ex. 3, at 2. USF&G also reserved all rights and stated that the letter should not be construed as a waiver of any right or defense.

On February 25, 2008, Liberty Mutual wrote Ash Grove to document a telephone conversation in which Ash Grove advised that it would provide notice to the insurer of potential claims but that it was not involved in any litigation and was not presenting a formal claim.

On March 25, 2008, Ash Grove sent USF&G a letter informing the insurer that Ash Grove had retained Leslie Nellermoe to defend it in connection with the Site.[4]

On May 27, 2008, Ash Grove wrote Liberty Mutual to explain the history of the LWG and to note that the EPA sent 104(e) requests to 280 entities. Ash Grove also stated Liberty Mutual was responsible for payment of the significant expense Ash Grove incurred to respond to the 104(e) request. This letter was the first time Ash Grove informed Liberty Mutual that it was incurring costs to respond to the EPA's inquiries or asked Liberty Mutual to reimburse those costs.

Ash Grove submitted its initial response to the 104(e) request on October 24, 2008 and has not received any written communication from the EPA since. Ash Grove intends to supplement its response and has put some effort into the supplement.

---

[4] The court does not have a copy of this letter.

PAGE 6 - OPINION AND ORDER

In November 2008, Ash Grove sent invoices to USF&G listing costs Ash Grove incurred responding to the 104(e) request. This was the first time USF&G learned Ash Grove expected USF&G to reimburse defense costs.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to point out the absence of any genuine dispute of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains a fact dispute to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the court "must view the evidence on summary judgment in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party." Nicholson v. Hyannis Air Service, Inc., 580 F.3d 1116, 1122 n.1 (9th Cir. 2009) (internal quotation omitted).

## DISCUSSION

On September 30, 2010, I filed an Opinion and Order in which I held that the 104(e) request for information the EPA sent to Ash Grove, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9604(e), constituted a "suit" under the terms of the insurance policies and the Oregon Environmental Cleanup Assistance Act ("OECAA"), ORS § 464.480, thus triggering the insurers' duty to defend Ash Grove.

In these cross motions, the parties dispute when liability under the duty to defend began and when it ends.

I.        Defense Costs Prior to Ash Grove's Tender of the Defense

Based on Ash Grove's failure to tender earlier, and Ash Grove's failure to get permission to incur costs prior to the tender dates, the insurers ask the court to conclude as a matter of law that they have no obligation to reimburse Ash Grove for any defense costs incurred prior to the tender dates.

        A.        Date of Tender

The tender dates themselves are at issue.  Thus, I must determine whether putting the insurers on notice of the 104(e) request is sufficient to trigger the duty to defend.

The insurers argue that the duty to defend Ash Grove did not begin until the company tendered the 104(e) request to them, specifically May 27, 2008 for Liberty Mutual and November 2008 for USF&G.  Prior to those dates, the insurers contend that Ash Grove informed them of the 104(e) request but did not ask the insurers to take any action and did not ask for a defense.

Ash Grove contends the insurers' duty to defend was triggered when Ash Grove forwarded the 104(e) request to Liberty Mutual and USF&G on January 29, 2008.  Ash Grove argues that the policies do not make the tender of the defense an additional step after providing notice of a claim.  According to Ash Grove, once it sent the 104(e) request to the insurers, the insurers had a duty to investigate whether coverage existed unless Ash Grove specifically asked the insurers not to defend.  Ash Grove argues that case law from other jurisdictions which requires the insured to make an affirmative request for a defense, beyond simple notification of a claim, should not be applied here because the policy language does not put that burden on the insured.

"An insurer is not obligated to defend any action not tendered to it." Am. Cas. Co. v. Corum, 139 Or. App. 58, 63 n.3, 910 P.2d 1151 (1996). Ash Grove argues this is dicta but the rule is followed in other jurisdictions. See Unigard Ins. Co. v. Leven, 983 P.2d 1155, 1160 (Wash. Ct. App. 1999) ("the insured must affirmatively inform the insurer that its participation is desired"); Purvis v. Hartford Accident and Indem. Co., 877 P.2d 827, 830 (Ariz. Ct. App. 1994) ("What is required is knowledge that the suit is potentially within the policy's coverage coupled with knowledge that the insurer's assistance is desired.") (internal quotation omitted).

Importantly, however, the Oregon case does not explain what conduct is necessary to tender a claim or suit. Gaining no guidance from Corum, I turn to the policies, which state:

> Insured's Duties in the Event of Occurrence, Claim or Suit
>
> (a) In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place, . . . shall be given by or for the insured to the company or any of its authorized agents as soon as practicable. The named insured shall promptly take at his expense all reasonable steps to prevent other bodily injury . . . .
>
> (b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.
>
> (c) The insured shall cooperate with the company and, upon the company's request, assist in making settlements . . . ; and the insured shall attend hearings and trials . . . . The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

Row Decl. Ex. B, at 32, Conditions–Insured's Duties in the Event of Occurrence, Claim or Suit. There are no other duties listed for the insured. The policies further state: "[T]he company shall have the right and duty to defend any suit against the insured seeking damages on account of

PAGE 9 - OPINION AND ORDER

such bodily injury or property damage . . . and may make such investigation and settlement of any claim or suit as it deems expedient . . . ." Id. at 30.

The Oregon legislature also weighed in on what the insurer must do after receiving notice: "Failing to adopt and implement reasonable standards for the prompt investigation of claims" is an unfair claim settlement practice under ORS 746.230(1)(c).

Ash Grove's argument is convincing. As far as I know, the policies do not define a tender and do not make it a separate obligation from the duty to provide notice, which Ash Grove provided on January 29, 2008. After receiving notice, the insurers have a statutory duty to investigate. Without clear Oregon case law or policy language requiring a tender to be something beyond notice, I have to conclude that the duty to defend may have been triggered as early as January 29, 2008. I agree with Ash Grove, however, that an insured can tell its insurer that it does not yet want a defense. The record before me creates a factual issue on whether Ash Grove asked the insurer to wait. Consequently, I cannot grant summary judgment on when the duty to defend began.

      B.      Voluntary Payment Condition

The insurance policies include a voluntary payment policy, with Liberty Mutual's policy effective January 1, 1969, stating: "The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the accident." Row Decl. Ex. B, at 32, Conditions–Insured's Duties in the Event of Occurrence, Claim or Suit. Liberty Mutual's other policies, as well as the policies from USF&G, include a substantially similar condition. The insurers claim they are not obligated to reimburse

any expenses Ash Grove incurred prior to the dates of tender because the payments are voluntary ones prohibited by the policies.

Ash Grove argues that the insurers waived the voluntary payments condition by refusing to defend Ash Grove. Ash Grove relies on <u>Holloway v. Republic Indem. Co. of Am.</u>, 201 Or. App. 376, 119 P.3d 239 (2005), <u>rev'd on other grounds</u>, 341 Or. 642, 147 P.3d 329 (2006), in which the insurer denied a defense to its insured in an employee's sexual harassment suit. After the insurer denied a defense by never responding to the request, the insured settled the suit by stipulating to entry of a $50,000 judgment in exchange for a $6,000 payment by the insured and assignment of the insured's rights against the insurer. The court held that the insurer waived the no voluntary payment condition by refusing to defend the insured. <u>Id.</u> at 380-81.

Because there are factual issues on when the duty to defend began, there are also factual issues on when the insurers refused to defend Ash Grove. Thus, I cannot determine until trial if the insurers waived the voluntary payment condition.

II.     Costs for the Alternate Dispute Resolution Process

The insurers ask the court to limit their defense obligation to the costs Ash Grove reasonably and necessarily incurred to respond to the 104(e) request. Specifically, the insurers argue they are not obligated to pay for Ash Grove's participation in the ADR process Batson initiated in January 2008, prior to Ash Grove's receipt of the 104(e) request. According to the insurers, the Batson letter is merely an invitation to attend a voluntary informational meeting, with no requests to perform a task, produce a document, conduct an investigation, and no penalty for nonattendance. The insurers note the number of recipients of the Batson letter who are not taking part in the ADR process. The insurers also rely on my previous ruling that the 104(e)

PAGE 11 - OPINION AND ORDER

request triggered their duty to defend. Thus, they contend that the defense obligation is limited to action Ash Grove took to comply with that request, which the insurers believe ended when Ash Grove filed its response with the EPA on October 24, 2008. The insurers maintain that actions Ash Grove took and will take in anticipation of future claims or suits, which may or may not transpire, are not defense costs even though participation in the ADR process may be a prudent business decision.

Ash Grove argues that the duty to defend includes the ongoing ADR process until the liability is resolved. The company contends that the duty to defend is a duty to defend against a covered liability and not against a document such as the 104(e) request. In environmental cleanup actions in particular, Ash Grove contends, Oregon courts recognize that a defense involves activities broader than those in typical civil litigation. Ash Grove argues that responding to the 104(e) request is part and parcel of a defense to liability for the Site cleanup and is only the start of a compulsory administrative process. According to Ash Grove, the ADR process is intertwined with the 104(e) request and is focused on Ash Grove's liability. Most importantly, Ash Grove argues that its participation in the ADR process is essential to limiting its liability because it can advocate for a lower allocation prior to the EPA issuing a unilateral order which is nearly impossible to challenge. Ash Grove claims that the EPA will not negotiate resolutions outside the ADR process. Ash Grove reasons that the duty to defend continues until no set of facts exists under which the insurers may be responsible for indemnifying Ash Grove.

It is true that the OECAA defines a "suit" to include activities well beyond formal judicial proceedings:

> "Suit" or "lawsuit" includes but is not limited to formal judicial proceedings, administrative proceedings and actions taken under Oregon or federal law, including actions taken under administrative oversight of the Department of Environmental Quality or the United States Environmental Protection Agency pursuant to written voluntary agreements, consent decrees and consent orders.

ORS 465.480(1)(a). This definition makes determining the end of liability for defense costs far murkier than if the EPA sued Ash Grove in court. Consequently, this issue is better framed as whether the ADR process is a reasonable and necessary defense cost.

I am persuaded by Ash Grove's argument that the ADR process might be a reasonable and necessary defense cost because, in a practical sense, Ash Grove must take part in the ADR process to have any chance of influencing its ultimate responsibility for cleanup costs at the Site. This is in spite of the fact that participation in the ADR process is completely voluntary. I view the 104(e) request as equivalent to the Complaint filed in typical civil litigation. The duty to defend in court is not limited to costs incurred to draft and file an Answer, and I cannot decide as a matter of law that defense costs here are limited to the response to the 104(e) request.

ORS 465.480(6)(a) also provides a much broader definition of defense costs than is generally seen in a typical civil litigation:

> There is a rebuttable presumption that the costs of preliminary assessments, remedial investigations, risk assessments or other necessary investigation, as those terms are defined by rule by the Department of Environmental Quality, are defense costs payable by the insurer, subject to the provisions of the applicable general liability insurance policy or policies.

Based on the briefing before me, I have little sense of what is taking place in the ADR process. I conclude that this is a factual issue which requires resolution at trial. If Ash Grove believes that portions of the ADR process, or all of it, are reasonable and necessary defense costs,

Ash Grove can attempt to prove it at the court trial. I caution both sides, however, that they cannot paint the process with a broad brush. I might decide that certain activities in the ADR process are covered defense costs and others are not. Thus, I will need details on what categories of activities are occurring and what costs are incurred for each category.

Ash Grove raises another issue which more clearly extends the duty to defend past Ash Grove's October 2008 response to the EPA. Ash Grove states that it has a continuing obligation to supplement its response if it obtains new information. Ash Grove obtained such new information while investigating how to respond to an ADR questionnaire, and it is working on and intends to submit a supplemental 104(e) response to the EPA. If Ash Grove does submit a supplemental response, the duty to defend would cover all reasonable and necessary costs to prepare it.

## CONCLUSION

Defendant Liberty Mutual Insurance Company's Motion for Partial Summary Judgment [175], United States Fidelity and Guaranty Company's Joinder in Liberty Mutual Insurance Company's Motion for Partial Summary Judgment [180], Plaintiff's Cross-Motion for Partial Summary Judgment Against Liberty Mutual Insurance Company [186], and Plaintiff's Cross-Motion for Partial Summary Judgment Against United States Fidelity and Guaranty Company [191] are denied.

///

///

///

///

Three motions to compel are pending. I ask counsel to confer and inform the court by July 15 which subparts of the motions still require resolution in light of this ruling. After I rule on the motions to compel, I will hold a conference to reschedule the trial.

IT IS SO ORDERED.

Dated this  20  day of June, 2011.

      /s/ Garr M. King
Garr M. King
United States District Judge