IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ASH GROVE CEMENT COMPANY,
a Delaware corporation,

                    Plaintiff,

        v.

LIBERTY MUTUAL INSURANCE
COMPANY, a Massachusetts company,
and UNITED STATES FIDELITY &
GUARANTY COMPANY, a Maryland
insurance company,

                    Defendants.

No. 3:09-cv-00239-HZ

FINDINGS OF FACT &
CONCLUSIONS OF LAW

Michael E. Farnell
Seth H. Row
Parsons Farnell & Grein, LLP
1030 SW Morrison
Portland, OR 97205

Andrew N. Sachs
Michael R. Wrenn
Wrenn Bender McKown & Ring, LLLP
601 Union Street, Suite 5305
Seattle, WA 98101

        Attorneys for Plaintiff

1 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Kevin G. McCurdy
McCurdy & Fuller
4300 Bohannon Drive, Suite 240
Menlo Park, CA 94025

Thomas M. Christ
Cosgrave Vergeer Kester, LLP
500 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204

      Attorneys for Defendant Liberty
      Mutual Insurance Company

Andrew S. Moses
Thomas A. Gordon
Gordon & Polscer, LLC
9755 SW Barnes Road, Suite 650
Portland, OR 97225

      Attorneys for Defendant United States
      Fidelity & Guaranty Company

HERNANDEZ, District Judge:

      This case involves an insurance coverage dispute related to the Portland Harbor

Superfund Site.  Plaintiff Ash Grove Cement Company contends that Defendants Liberty Mutual

and United States Fidelity & Guaranty breached insurance policies when they failed to defend

Plaintiff against claims arising out of the Portland Harbor Superfund Site.  Plaintiff claims

damages of $2,271,838.58 for defense costs paid to attorneys, consultants, and experts.

Beginning March 26, 2013, the court held a three-day trial.  The following are my findings of

fact and conclusions of law.

BACKGROUND

      Plaintiff Ash Grove operates cement plants on the Willamette River.  Defendants Liberty

Mutual ("Liberty") and U.S. Fidelity & Guaranty ("USFG") provided liability insurance to

Plaintiff in the past.  As authorized by Section 104(e) of the Comprehensive Environmental

Response, Compensation, and Liability Act ("CERCLA"), the U.S. Environmental Protection Agency ("EPA") requested information from Plaintiff to aid the EPA's investigation of hazardous releases in the Superfund Site. Plaintiff asked Defendants to tender a defense, but Defendants refused. Plaintiff filed the present action and brought two claims. First, Plaintiff claimed breach of contract, alleging that Defendants had a duty to defend and indemnify based on the insurance policies. Second, Plaintiff sought a declaratory judgment that Defendants are obligated to defend and indemnify Plaintiff.

The parties moved for partial summary judgment on the issue of whether the EPA's request for information under section 104(e) of CERCLA ("104(e) request") was a "suit" under Defendants' insurance policies, thus triggering the duty to defend. Judge King concluded that the EPA's 104(e) letter was a "suit seeking damages" and that Defendants had a duty to defend Plaintiff. Sept. 30, 2010 Op. & Order at 11, Dkt. #116.

The parties again moved for partial summary judgment to determine the scope of the duty to defend. The two issues presented were: (1) whether Defendants were obligated to reimburse Plaintiff for defense costs prior to the tender of defense and (2) whether Defendants were obligated to pay for the allocation process in which Plaintiff is a participant. June 20, 2011 Order at 8 and 11, Dkt. #208.

Judge King found that the date of tender was January 28, 2009—the date that Plaintiff forwarded the 104(e) request to both Defendants. Id. at 10. However, there was a question as to whether Plaintiff requested that Defendants delay tendering a defense. This factual issue was reserved for trial. Id. Regarding the second issue, Judge King found that participation in the allocation process was a reasonable and necessary defense cost. Id. at 13. However, at trial, Plaintiff would have the burden to show that portions, or all, of the allocation process were

reasonable and necessary defense costs.  Judge King also found that the duty to defend extends

to Plaintiff's supplemental response to the 104(e) request.  Reasonable and necessary costs to

prepare the supplemental response would be part of Defendants' duty to defend.  Id. at 14.

FINDINGS OF FACT

I.      Date of Tender

        Robert Dabler is the risk manager for Plaintiff Ash Grove.  Tr. 414.  He has held that

position for the past 16 years.  Tr. 413.  One of Dabler's job duties is to obtain insurance for the

company and to notify insurance carriers of claims.  Tr. 414.

        A.      Notice to USFG

        On January 29, 2008, Dabler sent a letter to Travelers[1], requesting that the letter be

treated "as a first report of claim" for Plaintiff's potential liability at the Superfund Site.  Tr. 428,

Ex. 148.  Dabler testified that he did not request that USFG or Travelers delay tendering a

defense.  Tr. 430.  On February 28, 2008, Paula Rose, a senior account executive for Travelers,

responded to Dabler's letter.  Ex. 158.  Rose acknowledged receipt of Dabler's January 29th

letter and outlined the steps that Travelers would take.  Id. at 1.  The tasks included searching for

relevant policies and determining "[w]hether [Travelers] has a duty to pay…for a lawyer to

represent [Plaintiff] Ash Grove Cement Company for the Portland harbor Superfund Site[.]"  Id.

On March 25, 2008, Dabler sent a letter to Rose to advise Travelers that Leslie Nellermoe had

been hired to represent Plaintiff in the Superfund Site matter.  Ex. 162.  Rose's notes from her

file indicate that she and Dabler exchanged phone messages, but nothing more.  Exs. 233, 234.

On August 13, 2008, Rose wrote to Dabler to inform him that Travelers was "unable to make a

coverage determination at this time."  Ex. 185 at 3.  Rose requested additional information to

---

[1] The letter was sent to Travelers because Dabler understood that Defendant USFG was being
purchased by Travelers.  Tr. 428.

help with Travelers' investigation.  Id.  Dabler understood the letter to mean that Travelers

needed more time to investigate the claim.  Tr. 445.

        B.       Notice to Liberty Mutual

       Dabler also sent Defendant Liberty Mutual a letter on January 29, 2008 to forward the

104(e) letter from the EPA.  Tr. 431, Ex. 149.  In the letter, Dabler gave notice of a particular

policy "that would apply to this claim."  Ex. 149 at 1.  Dabler testified that he sent the letter to

keep Liberty Mutual informed about the claim for the Superfund Site.  Tr. 432.  On February 25,

2008, Laurie Dunn, an environmental claims specialist with Liberty Mutual, responded to

Dabler's letter.  Ex. 159.  Dunn wrote that "at this time [Plaintiff] is not involved with any

litigation and is not presenting any formal claim.  Therefore, Liberty Mutual will continue to

treat this matter as record only."  Id. at 1.  Dunn further requested Dabler to advise her if Liberty

Mutual's "understanding of your notice" is incorrect.  Id.  Dabler testified that Liberty Mutual's

reference to Plaintiff's claim as "record only" did not mean anything to him.  Tr. 437.  He did not

contact Dunn because he believed that he had complied with the conditions of the policy to

provide notice to Liberty Mutual of the claims.  Id.

       Dunn testified[2] that she asked Dabler if he was making a claim, but that Dabler told

Liberty Mutual that he was not making a claim.  Ex. B at 39.  She also stated that Liberty Mutual

uses the term "record only" if the insured submits a potential claim.  Id. at 70.  If a claim is

labeled "record only," Liberty Mutual will not review policy language or investigate the matter.

Id. at 72.

       On March 25, 2008, Dabler sent a letter to Dunn, advising Liberty Mutual that Leslie

Nellermoe had been hired to represent Plaintiff in the Superfund Site matter.  Ex. 163.  On May

---

[2] Dunn's testimony is taken from her deposition on January 21, 2011.  Her deposition
designations are found in the Court's Exhibit B.  At the time of her deposition, Dunn's name had
changed to "Pearson", but for the sake of clarity, I will continue to refer to her as "Dunn."

27, 2008, Dabler wrote to Dunn, stating that Plaintiff was incurring "significant dollars in defense costs", that the costs would be ongoing, and that Liberty Mutual is responsible for the costs. Ex. 168 at 2.

II.      Scope of Duty to Defend

        A.      104(e) Request

        On January 18, 2008, the EPA sent a letter to Plaintiff regarding the Superfund Site. Ex. 146. The EPA sought Plaintiff's cooperation as it continued to investigate the "releases of hazardous substances associated with the Portland Harbor Superfund Site." Id. at 1. Under section 104(e) of CERCLA, the EPA requested that Plaintiff complete the 15-page, 82-question information request. Ex. 147. If Plaintiff did not respond to the 104(e) request, Plaintiff could face penalties of up to $32,500 for each day of noncompliance. Ex. 146 at 2. The EPA also advised that there is "an ongoing duty under this first Information Request to supplement your response with any additional information or documents that become available or known to you after you submit your response." Id. The deadline to respond was May 16, 2008. Ex. 146 at 2.

        Plaintiff is a heavy industrial manufacturer and frequently deals with the EPA. Tr. 508. Its operating philosophy is to comply with regulations fully and to be open with the EPA in order to maintain its reputation. Id. To respond to the 104(e) request, Plaintiff assembled a team to help gather documents for the response. Tr. 515. Trinity Consultants was hired to collect, scan, and organize the documents that numbered over 100,000. Tr. 76, 515. Trinity also helped draft answers to some of the questions. Tr. 76. Ajilon Temp Services was hired to help organize the voluminous document collection. Id. Plaintiff requested an extension of time (Ex. 166) and filed its 237-page response on October 24, 2008. Ex. 194. Plaintiff followed the EPA's instructions to provide narrative responses to the questions, rather than referencing the EPA to submitted

documents.  Tr. 68-69.  Plaintiff has been working on an update to its response to the 104(e)

request.  Tr. 136-37.  Since the initial response, there have been significant changes at Plaintiff's

facilities.  Tr. 518-20.  For example, a new glycol cooling system was installed, which eliminated

a discharge of 14,000 gallons per day of cooling water into an irrigation field.  Tr. 519.

      B.    Allocation Process

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

  C.  Natural Resources Damage

  On January 3, 2008, the Portland Harbor Natural Resource Trustee Council ("NRTC") invited Plaintiff to participate and fund and injury assessment for the Superfund Site. Ex. 231 at 2. On January 30, 2008, the NRTC sent another letter, stating that Plaintiff was identified as being potentially liable for "response costs under Section 107 of the CERCLA." Id. at 1. The

8 - FINDINGS OF FACT & CONCLUSIONS OF LAW

letter further stated that "[t]his notice is separate from the EPA [104(e)] notice and is connected with the Natural Resource Damage Assessment portion of the CERCLA cleanup action of Portland Harbor." Id.  The natural resources damage concerns the same Superfund Site, but is managed by a different agency, has a different process for resolution, and a different allocation of liability.  Tr. 354.  A natural resources damage assessment typically follows a CERCLA case. Tr. 378.

Plaintiff was invited to an informational meeting to learn more about the NRTC's interests.  Id.  Nellermoe did not attend the meeting because Plaintiff did not believe that it had caused any natural resource damage from the release of hazardous substances.  Tr. 63.  Instead, Plaintiff decided to join a group of seven other parties, known as the Group of Eight ("G8") to address the potential natural resource damage liability.  Tr. 100.  The G8's purpose is to stay informed about the NRTC's activities, attempt to influence the NRTC's approach to the cleanup, and identify and fund habitat restoration projects in an effort to settle the natural resource damage claims.  Tr. 101.  The G8 hired Geosyntec, a firm experienced in natural resource damage, to help with the process.  Tr. 100.  Howard Cumberland, a scientist with Geosyntec, is also an expert for the NRTC.  Tr. 101.  With the help of Geosyntec, the G8 members hope to settle with the NRTC by funding a project that would satisfy the number of "units" of liability assigned to the G8.  Id.

D.    Terminal Facility

 Plaintiff maintains two facilities along the Willamette River:  the Rivergate and Terminal facilities.  Tr. 109, 111.  The Rivergate facility is located at River Mile 2.8 and was acquired in 1963 from the Port of Portland.  Tr. 111; Pretrial Order, 4 (Dkt. #276).  Limestone is created at this facility.  Tr. 111.  The Terminal facility is located between River Miles 10.1 and 10.5 and

consists of a north and south terminal.  Tr. 110.  The south terminal was acquired in 1992 from Union Pacific Railroad and the north terminal was acquired in 2005 from Goldendale Aluminum Company.  Tr. 494-95.

From January 1, 1963 to January 1, 1970, Defendant Liberty Mutual insured Plaintiff. Exs. 501-507.  Over the course of those years, seven policies were issued.  Id.

From January 1, 1973 to January 1, 1986, Defendant USFG insured Plaintiff.  Exs. 601-11.  Over the course of those years, 11 policies were issued.  Id.

E.    Aleris Bankruptcy

Aleris was a prior owner of the Terminal facility.  Tr. 120.  While Aleris was in bankruptcy, Plaintiff pursued a claim against Aleris and recovered $5000.  Id.  Pursuing a claim against Aleris was not part of the CERCLA action.  Tr. 398.  But it was a way to obtain assets that could fund the remedy at the Superfund Site.  Id.

III.    Reasonableness of Fees

Gary Church, assistant general counsel for Plaintiff, reviewed all the invoices for work performed by the attorney's and consultants.  Tr. 522, 527-30.  Church managed the project on behalf of Plaintiff and was intimately involved with the work related to the Superfund Site.  Tr. 515.  At the time he approved the invoices, he had a contemporaneous understanding of the work performed.  Tr. 522.

Jeffrey Ring, Plaintiff's expert, opined that Plaintiff's response to the 104(e) letter and the disclosure questionnaire was appropriate.  There are many reasons why a company would submit a less thorough response.  Tr. 283.  Some factors include the document retention policies of the company, the time that the company has operated at the Superfund Site, the likelihood of

pollution resulting from the company's operations, and the financial resources of the company. Tr. 283-84.

William Goodhue, Jr., expert for Defendants, has a bachelor's and master's degrees in geology. Tr. 545. He opined that Trinity's work on the 104(e) response and the disclosure questionnaire went beyond what was necessary for a sufficient response. Tr. 549-50. Goodhue has never assisted a client to respond to a 104(e) request, but he has worked on projects that involve data collection. Tr. 638. Goodhue testified that Trinity's work was inefficient and lacked proper documentation. Tr. 554. He recommended that $286,803 be deducted from the total billed for the 104(e) response; and $147,913 be deducted from the total billed for the response to the disclosure questionnaire. Tr. 554-55.

John Pierce, expert for Defendants, was retained to evaluate the reasonableness of Plaintiff's attorney's fees. Tr. 651. Since 1989, Pierce has evaluated fees for construction, toxic tort, and Superfund cases in a variety of jurisdictions. Id. In formulating his opinion, Pierce considered Model Rule 1.5 and case law in this jurisdiction regarding billing practices. Tr. 656.

A.      PCI Group

Plaintiff has contributed funds to the PCI Group. Tr. 527-28. A total of $118,500 was contributed. Exs. 14-17, 124, 283, 230a at 1, 4. In addition, $1,179.55 was paid to Searchlight, the company that created the repository of documents for the PCI Group. Tr. 533; Ex. 125.

B.      Trinity Consultants

Trinity Consultants is an environmental consulting company that specializes in air quality. Tr. 178. Maren Seibold, a managing consultant with Trinity, managed the collection and review of documents for the 104(e) response. Tr. 179, 180. The task consisted of reviewing hard and electronic records from multiple locations, evaluating the records for responsiveness to

the 104(e) request, and drafting a response to the 104(e) request.  Tr. 181.  Because the 104(e)

request used broad terms, the document search was broad as well.  Tr. 185.  Plaintiff sought

clarification from the EPA, but that clarification did not come until three to four months into the

document collection effort.  Tr. 198-99.  The search for documents turned up tens of thousands

of documents.  Tr. 188.  The amount of documents that were eventually attached to the 104(e)

response was approximately 5% of the total documents collected.  Tr. 209.

     Trinity's work on the 104(e) response totaled $468,780.79.  Tr. 182; Exs. 65-74, 230a at

2.  Trinity kept costs down by utilizing junior level staff , Tr. 190, and hired Ajilon to outsource

the scanning of documents, Tr. 181, 192.  Seibold supervised the Ajilon workers.  Tr. 192.  The

invoices for Ajilon, dated March 16, 2008 to June 29, 2008, total $7,137.50.  Ex. 230a at 1.

     Trinity also helped with the response to the PCI Group disclosure questionnaire from

December 2010 to December 2011.  Tr. 180; 212.  Although there was some overlap between the

104(e) request and the disclosure questionnaire, the questionnaire required information past the

May 2008 cutoff of the 104(e) request.  Tr. 210.  The disclosure questionnaire also delved into

two areas that were not mentioned in the 104(e) request:  air pathways and bank erosion.  Tr.

211-12.  Trinity's work on the disclosure questionnaire totaled $290,733.73.  Tr. 213; Exs. 75-

87, 230a at 2.

     Trinity also assisted with the update to the 104(e) response.  Tr. 215.  Trinity's work on

the update totaled $29,141.65.  Exs. 88a, 89a, 90-96, 230a at 3.  Some of the work on the update

overlapped with work performed for the PCI Group disclosure questionnaire.  Tr. 218.

     C.     Geosyntec

     Rather than fund the NRTC assessment, Plaintiff opted to join the G8 to address the

natural resources damages claim.  From December 2011 to December 2012, Plaintiff paid

Geosyntec $105,519.99. Exs. 42-46, 230a at 2. Geosyntec provides a budget and explanation in advance of the work to be performed. Tr. 542.

       D.     Nellermoe

When Nellermoe was initially hired by Plaintiff, she worked for Heller Ehrman. Exs. 162, 163. From February 20, 2008 to November 21, 2008, Nellermoe billed a total of $215,364.73. Exs. 47-56, 230a at 2. Nellermoe later worked at Davis Wright Tremaine. Tr. 113. From November 25, 2008 to November 4, 2010, Nellermoe billed a total of $477,384.33[3]. Exs. 18-41, 230a at 1; Tr. 116. Nellermoe next worked at the Wrenn Law Group. Tr. 113-14. From December 2010 to August 2012, Nellermoe billed a total of $454,210.28. Exs. 97-117, 230a at 3. Nellermoe currently works at Wrenn Bender McKown & Ring. Tr. 114. From August 2012 to January 2013, Nellermoe billed a total of $70,974.33. Exs. 97-122; 230a at 3. In sum, Nellermoe[4] has billed Plaintiff a total $1,217,933.57 for work performed in connection with the Superfund Site.

Pierce segregated Nellermoe's fees into broad categories.[5] For example, on the Aleris bankruptcy matter, she billed $15,558.75. Tr. 667. For Nellermoe's work on committees within the PCI Group, she billed a total of $146,163.12 (Tr. 676-77) and an additional $18,181.59 (Tr. 694-96) was billed specifically for work on the insurance committee. There are instances in which Nellermoe consistently block billed, in which a single entry of time would contain

---

[3] Nellermoe testified that one of the Davis Wright Tremaine invoices, Ex. 27, did not relate to work for Plaintiff on the Superfund Site. To correct for the miscalculation in Ex. 230a, Plaintiff states that $332 should have been subtracted. Pl.'s Am. Closing Br., 2 n5.

[4] The invoices show that Nellermoe had the assistance of other attorneys from her firm, but the majority of the fees are a result of her work.

[5] Pierce's analysis of attorney's fees is limited to fees through January 31, 2012. Dkt. #343. However, Plaintiff submitted invoices for fees through November 30, 2012. Defendants filed a motion in limine to exclude invoices (Exs. 112-122) for fees incurred in 2012. I denied the motion at the pretrial conference because Defendants had opportunity to cross-examine Nellermoe about the invoices.

13 - FINDINGS OF FACT & CONCLUSIONS OF LAW

multiple tasks performed.[6]  Tr. 377, 680.  For time entries greater than an hour, Pierce found that

Nellermoe block billed 54% of the time at Heller Ehrman, 76% of the time at Davis Wright

Tremaine, and 79% of the time at her current firm.  Tr. 681, 685.  Pierce recommended a 25%

deduction for block billing practices.  Tr. 683.  Pierce also recommended a 20% deduction based

on Nellermoe's practice of billing in quarter, half, and whole hours, as opposed to a smaller

increment of a tenth of an hour.  Tr. 682, 689.  The invoices submitted by Nellermoe show that

the majority of her entries round to the half hour or whole hour.  Finally, Pierce recommended a

30% deduction for vague billing entries, such as "document review."  Tr. 697.

       E.      Miscellaneous Costs

      Plaintiff used Intercall to host conference calls to discuss the status of the Superfund Site

matter.  Tr. 530.  Plaintiff no longer uses Intercall because it has found an alternative that is

essentially free.  Id.  The invoice from Intercall from March 2008 to October 2008 total

$13,715.80.  Exs. 57-64, 230a at 2.

      Plaintiff purchased a document scanner to scan 750 large documents collected in

response to the 104(e) request.  Tr. 531.  Using a third party to scan the documents would have

been more expensive.  The cost of the scanner was $19,196.00.  Exs. 123, 230a at 3.

IV.     Settlement Setoff

      Hartford Accident and Indemnity Company is a former defendant in this case.  Hartford

settled with Plaintiff for $340,000 and was dismissed.  Ex. A at 10.  In consideration for the

$340,000, Plaintiff released Hartford from all claims arising from its policies with Hartford.  Ex.

525 at 5.  "All" claims included "actual or alleged, known or unknown, accrued or unaccrued,

---

[6] One example of Nellermoe's block billing:  On June 29, 2009, 10.0 hours were billed for
"Conference call with Messrs. Wright, Dollar, Church and Ms. Flink regarding Letter from DEQ
regarding site assessment; Meeting with participation Group Insurance Subcommittee; meeting
with Mr. Ashton, Port of Portland, regarding Ash Grove retaining Hart Crowser, Site Assessment
By Ecology."  Ex. 27 at 2.

existing or potential" claims that Plaintiff had or would have had in the future.  Id.  At the time of

the settlement, Plaintiff had only requested coverage for the Superfund Site.

CONCLUSIONS OF LAW

I.      Motion to Strike Testimony of Jeffrey Ring

        Defendants renewed their motion to strike the testimony of Plaintiff's expert, Jeffrey

Ring, who opined on the reasonableness of attorney and consulting fees.  Def. Liberty Mutual

Post-Tr. Br., 12 n2; Def. USFG Post-Tr. Br., 11 n3.  Defendants argue that Ring's testimony has

no objective basis.  They also argue that Ring is biased because he is a partner in the firm that

represents Plaintiff and that his clients are also involved in insurance coverage litigation

regarding the Superfund Site.

        A trial court has discretion to allow expert testimony if the testimony "'will assist the

trier of fact to understand the evidence or to determine a fact in issue;' (1) it is 'based upon

sufficient facts or data;' (2) it is 'the product of reliable principles and methods;' and (3) the

expert 'has applied the principles and methods reliably to the facts of the case.'"  Alaska Rent-A-

Car, Inc. v. Avis Budget Group, Inc., 709 F.3d 872, 882 (9th Cir. 2013) (quoting Fed. R. Ev.

702).  "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation

and is relevant to the task at hand.'"  Id. at 883 (quoting Primiano v. Cook, 598 F.3d 558, 564

(9th Cir. 2010)).  "Shaky but admissible evidence is to be attacked by cross examination,

contrary evidence, and attention to the burden of proof, not exclusion."  Id. at 882-83 (quotation

omitted).

        I have considered Ring's qualifications and listened to his testimony.  I disagree that

there is no objective basis for his testimony.  Ring has had experience in CERCLA cases since

1982.  Tr. 238.  Over the years, he has been responsible for responding to over thirty 104(e)

information requests.  Tr. 239-40.  Ring has worked on several Superfund Sites across the country.  Tr. 239.  Ring reviewed invoices and interviewed those individuals who would have knowledge about the invoices.  Tr. 255.  To formulate his opinion, Ring relied on the ABA Model Rule 1.5 factors and his experience with Superfund Sites.  I am persuaded that Ring has a sufficient basis for his opinion on whether costs were reasonable and necessary.  Furthermore, I do not find that Ring is biased due to the fact his current firm, Wrenn Bender, is representing Plaintiff.  Ring's expert report was written before he became a partner for Wrenn Bender.  Tr. 252.  Ring also testified that he will not receive any profit sharing from damages that arise from this case.  Id.  I deny Defendants' motion to strike Ring's testimony.

II.    Date of Tender

The issue is whether Plaintiff requested Defendants to delay tendering a defense after notice of the 104(e) letter was given on January 29, 2008.  I have considered the testimony from Dabler and Dunn, as well as the exhibits that document the communications between Dabler and the two Defendant insurers.  There is no evidence that Dabler requested the insurers to delay tendering a defense.

Although Defendant Liberty Mutual understood the claim to be "record only", Dabler never requested that the file be labeled as such.  Dunn's testimony conflicts with Dabler's testimony that he made a claim for the Superfund Site.  Weighing the evidence before me, I find that Dabler acted in accordance with the policy to provide notice of the claim and to update Liberty Mutual of the progress of the claim.

Given that there was no request to delay the tendering of defense, defense costs may begin accumulating on January 29, 2008.

/ / /

16 - FINDINGS OF FACT & CONCLUSIONS OF LAW

III.     Scope of Duty to Defend

The parties dispute whether Plaintiff's activities related to the Superfund Site should be considered defense costs.  "[W]herein the insurer has breached its duty to defend, it is the insured that must carry the burden of proof on the existence and amount of the site investigation expenses, which are then presumed to be reasonable and necessary as defense costs, and it is the insurer that must carry the burden of proof that they are in fact unreasonable or unnecessary."  Aerojet-General Corp. v. Transport Indemnity Co., 17 Cal. 4th 38, 64 (Cal. 1997).  Plaintiff can meet its burden by showing "(1) that the costs and fees sought are associated with actions conducted within the temporal limits of [defendant's] duty to defend, i.e., between tender of the defense and conclusion of the action; (2) the actions taken amount to a reasonable and necessary effort to avoid or at least minimize liability; and (3) the actions taken are reasonable and necessary for that purpose."  KLA-Tencor Corp. v. Travelers Indem. Co., 2004 U.S. Dist. LEXIS 15376, 13-14 (N.D. Cal. Aug. 4, 2004).

    A.  104(e) Request

Judge King previously found that Plaintiff's response to the 104(e) request is a defense cost.  Plaintiff also seeks costs for updating its 104(e) response.  I find that preparing a supplemental response to the 104(e) letter is reasonable and necessary.  The 104(e) request expressly states that Plaintiff has an ongoing duty to supplement its response.  Plaintiff has cited to several specific instances in which its operations have changed that would warrant an update to its 104(e) response from 2008, such as a new glycol cooling system.

    B.     Allocation Process

Plaintiff seeks to recover all costs related to the allocation process.  Defendants disagree that participating in the allocation process was beyond what was reasonable and necessary.

Judge King has previously found that allocation costs may be recovered if they were reasonable and necessary defense costs. I find that Plaintiff's participation in the allocation process was reasonable and necessary for certain activities that would likely result in a reduced share of liability for Plaintiff. Regarding the PCI Group, the following activities are reasonable and necessary defense costs: joining the PCI Group, answering the disclosure questionnaire, and supplementing the disclosure questionnaire.

Regarding Nellermoe's committee work, I find that only her work on the executive committee was reasonable and necessary. Nellermoe was necessary to ensure that there would be more than one allocator and to advocate Plaintiff's position for an early exit as a de minimis party. I am not persuaded that Nellermoe's work on the other committees was reasonable and necessary. Her work on the technical, insurance, and orphan potentially responsible parties committees did not focus specifically on reducing Plaintiff's liability. Although the work may have been helpful to Plaintiff, it was not necessary for Nellermoe to perform work on those committees.

C.      Natural Resources Damage

The fees and costs incurred to respond to the natural resources damage claim is related to Plaintiff's response to the 104(e) request. Although the claim for natural resources damage falls under a separate section of CERCLA, there is evidence that such a claim customarily arises from the CERCLA action. In other words, Plaintiff is faced with the natural resource damage claim as a consequence of the EPA's 104(e) request to Plaintiff. Because the two matters are related, Plaintiff is allowed damages for fees and costs incurred to respond to the natural resources damages claim.

/ / /

D.    Terminal Facility

Defendants argue that they do not have a duty to defend a claim arising out of the Terminal facility because the Terminal facility was acquired after their policies with Plaintiff had expired.  "The insurer has a duty to defend if the complaint provides *any basis* for which the insurer provides coverage."  Ledford v. Gutoski, 877 P.2d 80, 83 (Or. 1994).  Judge King has already found that the Defendants' duty to defend was triggered from the 104(e) request, which encompasses Plaintiff's  Rivergate and Terminal facilities.  Defendants do not argue that the duty to defend the Terminal facility is excluded by the 104(e) request or the language of their policies.  Although the issue of indemnification is not yet settled, the issue of the duty to defend the Terminal facility has already been decided.  I conclude that Plaintiff is allowed damages for fees and costs for work related to the Terminal facility.

E.  Aleris Bankruptcy

Defendants argue that time spent to pursue a claim against Aleris is not a defense cost.  I agree.  The matter was offensive in nature, in that the funds obtained would add to the assets available to the PCI Group.  I conclude that the duty to defend does not encompass the Aleris bankruptcy matter.

IV.    Reasonableness of Fees

A.    Trinity

Defendants argue that Trinity's fees should be reduced because they did not have the expertise to assist Plaintiff with its response to the 104(e) request, the PCI Group disclosure questionnaire, or the update to the 104(e) response.  There is no evidence that another expert would have done the same work more efficiently or cheaper than Trinity.  Although other companies responded to the 104(e) request differently, Plaintiff provided several reasons for its

approach to the 104(e) request and its choice of Trinity.  I conclude that no deductions are necessary for Trinity's fees.

      B.     Geosyntec

I have already found that Plaintiff is entitled to defense costs related to the PCI Group disclosure questionnaire and the natural resources damages claim.  Defendants main contention with Geosyntec is the lack of documentation of services performed.  However, there is evidence that Geosyntec provided budgets and a description of tasks before completing the work.  Defendants do not dispute Geosyntec's expertise.  I conclude that no deductions are necessary for Geosyntec's fees.

      C.     Nellermoe

Defendants do not contest Nellermoe's hourly rate.  Instead, they argue that it is impossible to determine the reasonableness of her fees due to her billing practices of block billing, billing in large increments, and vague entries.  Defendants' points are well taken.  It is impossible to determine the reasonableness of a fee if the court cannot determine the amount of time spent on the task or the task itself.  Plaintiff makes the distinction that damages from a breach of the duty to defend differ from a fee petition.  While I recognize the difference, it does not change the requirement that the requested damages or fees need to be reasonable.  "The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked.  Welch v. Metro. Life Ins. Co., 480 F.3d 942, 948 (9th Cir. Cal. 2007) (citing Gates v. Deukmejian, 987 F.2d 1392, 1397 (9th Cir. 1992).  Plaintiff is the "fee applicant" because it is seeking fees, though in the form of damages for its breach of duty to defend claim.

Block billing, vague entries, and billing in large increments (quarter, half, or hourly) pushes the analysis into the realm of speculation. In fact, block billing and vague entries are specifically discouraged in this district. <u>See</u> Message from the Court Regarding Fee Petitions, http://www.ord.uscourts.gov/index.php/court-policies-517/fee-petitions, last updated February 6, 2013; <u>see also</u> <u>McCormick & Schmick's Seafood Rests., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA</u>, No. 08-1011-AA, 2011 U.S. Dist. LEXIS 113881, at *15-16 (D. Or. Sept. 30, 2011) (30% reduction of fees for block billing and lack of detail). Therefore, Nellermoe's fees are reduced by 25% for block billing, vague entries, and billing in large increments of time. These deductions are not cumulative. For example, if an entry suffers from block billing and vagueness, only 25% will be deducted.

V.      Hartford Settlement Setoff

The issue is whether the sum Plaintiff received from Hartford should be deducted from Plaintiff's total damages. Defendants argue that Plaintiff is not entitled to a double recovery of damages. "Oregon law permits a non-settling party a credit when the plaintiff has settled with others. Where the plaintiff settles with third parties and then seeks damages for the same injuries from the defendant, the defendant is entitled to a setoff for the amount of the prior recovery." <u>Malbco Holdings, LLC v. AMCO Ins. Co.</u>, No. CV-08-585-ST, 2010 U.S. Dist. LEXIS 2007, at *9 (D. Or. Jan. 11, 2010) (citing <u>Maduff Mortg. Corp. v. Deloitte Haskins & Sells</u>, 779 P.2d 1083, 1088-89 (Or. Ct. App. 1989). The party seeking the setoff has the burden of proving that "the injuries for which recovery was sought were the same in each action." <u>Maduff</u>, 779 P.2d at 1089.

Defendants argue that Plaintiff's only claim against Hartford was for the Superfund Site—the same claim that Plaintiff has brought against Defendants. Therefore, Plaintiff is

seeking the same damages from Defendants and Defendants are entitled to a setoff of $340,000. However, the settlement with Hartford covered all possible claims, past and future, and was essentially a "policy buy-back." I have considered the evidence in the record and find that Defendants have not met their burden to show that the Hartford settlement exclusively covered claims related to the Superfund Site. From the plain language of the settlement agreement, Hartford obtained a broad release from Plaintiff for *all* claims that may arise from the policies. Even if Defendants were entitled to a partial setoff, there is no evidence in the record for me to determine what that amount would be. I find that Defendants are not entitled to a setoff of $340,000 from the Hartford settlement.

## CONCLUSION

Having weighed, evaluated, and considered the evidence presented at trial, I find the following activities to be outside the scope of the duty to defend: Nellermoe's participation on committees other than the executive committee and time spent on the Aleris bankruptcy matter. Furthermore, I find that Nellermoe's fees should be reduced by 25% for entries that suffer from block billing, vagueness, and billing in large increments of time. The categories of expenses and deductions are summarized in the table below.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

22 - FINDINGS OF FACT & CONCLUSIONS OF LAW

| Expense | Billed | Deductions | Subtotal |
|---|---|---|---|
| Ajilon Temp Services | $7,137.50 | None | $7,137.50 |
| PCI Group Contributions | $118,500.00 | None | $118,500.00 |
| Geosyntec | $105,519.99 | None | $105,519.99 |
| InterCall | $13,715.80 | None | $13,715.80 |
| Trinity Consultants | $788,656.17 | None | $788,656.17 |
| Konica Minolta Scanner | $19,196.00 | None | $19,196.00 |
| Searchlight (PCI Group document repository) | $1,179.55 | None | $1,179.55 |
| Attorney's Fees: Heller Ehrman, Davis Wright Tremaine, Wrenn Law Group, Wrenn Bender McKown & Ring | $1,217,933.57 | ▪ Aleris bankruptcy matter: $15,558.75<br>▪ Insurance committee: $18,181.59<br>▪ Committee work through January 31, 2012 (Ex. 111): $146,163.12[7] minus $16,827.68[8] for executive committee work equals $129,335.44<br>▪ Block billing: $155,542.06<br>▪ Vague billing: $4,798.73<br>▪ Large increment billing: $26,834.69<br>▪ Invoices dated March 6, 2012 to January 8, 2013 (Exs. 112-122) [9] – deductions for non-executive committee work and poor billing practices: $33,679.50 | $834,002.81 |

/ / /

/ / /

/ / /

/ / /

---

[7] The total amount of fees spent on committee work is taken from Pierce's expert report. Dkt. #343 at 18. His analysis ended with the invoice dated February 3, 2012 (Ex. 111). Dkt. #343 at 1.

[8] The parties were asked to provide supplemental briefing on the amount of fees that were billed for Nellermoe's participation on the executive committee. This amount represents the executive committee fees billed through Ex. 111, which is the last invoice analyzed by Pierce.

[9] In his report, Pierce did not include an analysis of the invoices from March 6, 2012 to January 8, 2013, Exs. 112-122. I have reviewed the invoices and made deductions for non-executive committee work and poor billing practices.

In conclusion, Plaintiff is awarded a sum of $1,887,907.82 for defense costs.

IT IS SO ORDERED.


Dated this __5th___ day of August, 2013.


/s/ Marco A. Hernandez_____
MARCO A. HERNANDEZ
United States District Judge